# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 899 | **DATE** | 6/17/2004 |
| **CASE TITLE** | Spectra Merchandising Intl, Inc. vs. Euler ACI Collection Services, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** Euler's motion (Docs 20-1 & 20-2) for summary judgment is granted for Counts I, II and III, and for judgment on the pleadings is granted as to Count IV. All matters in controversy having been resolved, final judgment is hereby entered.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | JUN 18 2004 | 30 |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| SCT | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in Central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
JUN 1 8 2004

| | | |
|---|---|---|
| SPECTRA MERCHANDISING INTERNATIONAL, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) | 03 C 899 |
| EULER ACI COLLECTION SERVICES, INC., | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on Defendant Euler American Credit Indemnity Company's ("Euler") motion for summary judgment and for judgment on the pleadings. For the reasons set forth below, the motions are granted.

## BACKGROUND

Plaintiff Spectra Merchandising International, Inc. ("Spectra") is an Illinois corporation that imports consumer electronics products from East Asia and distributes them to the retail market. Euler is a Maryland corporation that sells commercial credit insurance that protects seller-policyholders against the nonpayment of accounts receivable due to a buyer's bankruptcy or protracted default. Spectra purchased credit

30

insurance from Euler, and Spectra's corporate vice president Davy Cheung ("Cheung") had responsibility for obtaining Spectra's credit insurance. Cheung was assisted by credit manager Beverly Metzger ("Metzger"), who was training to take over some of Cheung's duties. In dispute are two credit insurance policies that Spectra purchased from Euler, the first of which insured Spectra for shipments made from November 1, 2000, until October 31, 2001 (the "First Policy"). The First Policy insured Spectra for ninety-one of its buyers. It provided that the maximum term of sale (between Spectra and its buyers) was thirty days. This meant that the First Policy only covered buyers from whom Spectra required payment within thirty days of delivery.

One company that was covered under the First Policy was Kmart, one of Spectra's most important customers. The First Policy insured Kmart as a "covered buyer" with a $500,000 limit, subject to 10% coinsurance (Spectra was responsible for 10% of any loss). In the midst of the First Policy's term, Spectra sought an increase in coverage for Kmart, which Euler refused to do. Euler also responded by raising Kmart's coinsurance to 20%, which was permitted under the First Policy. Moreover, Euler's policies allowed it to reduce or eliminate coverage for future shipments to covered buyers, upon giving the proper notice to the insured, according to changes in the covered buyer's credit risk.

Also during the term of the First Policy, Euler sales agent Randy Gilbert ("Gilbert") assumed responsibility over the Spectra account. Including Spectra, Gilbert handled thirteen to fifteen accounts and he was compensated based on a combination of salary and sales commissions. Like all Euler sales agents, Gilbert was not authorized to make decisions concerning the parameters of a policy, including the amount and cost of coverage as well as the specific terms of each policy. Such decisions were made by Euler's underwriting department and sales agents would have to seek its approval on policies before they would be delivered to clients.

As the First Policy was about to expire Gilbert obtained from Spectra information needed to quote a policy for the period from November 1, 2001, through October 31, 2002 (the "Second Policy"). Gilbert knew that Spectra was concerned with getting adequate coverage for Kmart, which would be covered for $500,000 under the Second Policy–as opposed to the increased coverage previously sought by Spectra. On October 23, 2001, Gilbert met with Cheung and Metzger in Chicago to discuss the terms of the Second Policy. As they were reviewing the Second Policy's terms, Gilbert pointed out the thirty-day maximum terms of sale provision. Cheung then realized that he had overlooked this provision and informed Gilbert that Spectra was selling to certain customers on sixty-day terms. In particular, Cheung told Gilbert that Spectra had previously changed the terms of sale of its biggest customer from thirty to sixty

days. In response to Cheung's concerns over the Spectra accounts with greater than thirty-day terms, Gilbert told Cheung that he could not personally approve a change in the terms of coverage. Gilbert instructed Cheung to prepare a list of Spectra's buyers who were sold to on greater than thirty-day terms that Gilbert could submit for approval by the proper authorities at Euler.[1]

Following the meeting, Cheung instructed Metzger to review Spectra's records and compile a list of its buyers that were sold to on greater than thirty-day terms. On October 25, 2001, Metzger faxed to Gilbert a list of eighteen accounts that Spectra sold to on greater than thirty-day terms (the "List"). Kmart was not included on the List, which was noticed by Cheung when he received a copy of the List a few days later. Cheung then instructed Metzger to contact Gilbert about Kmart's absence from the List. On October 26, 2001, Gilbert forwarded the List to Euler's underwriting department. However, Gilbert did not review the List to determine if Kmart was included.

That same day, Metzger e-mailed Gilbert a chart containing reductions in coverage for sixteen accounts. It also contained the sentence: "We need to change our terms of sale to 60 days across the board." Gilbert claims that he discussed this request

---

[1] It is disputed whether Cheung was aware that Euler's underwriting department was required to approve such a change, but Cheung knew that Gilbert lacked the authority to change the terms of a policy.

with Euler's underwriting department and was denied because the majority of Spectra's accounts were on thirty-day terms. Spectra alleges that no such conversation took place. In any event, on October 30, 2001, Gilbert sent Metzger a document outlining the revised terms and conditions of the Second Policy, which indicated that the maximum term of sale was thirty days. Metzger replied via e-mail that "the endorsement for 60 day accounts" was missing from the revision. Gilbert responded that coverage on sixty-day terms needed to be approved individually by the underwriting department and that he would inform Metzger when the sixty-day accounts were approved. On November 6, 2001, Gilbert informed Metzger that Euler was reducing the coverage on Kmart from $500,000 to $250,000, due to Kmart's deteriorating financial condition, and Gilbert endorsed the Second Policy accordingly.

On December 3, 2001, Gilbert met with Metzger and a broker recently retained by Spectra to deliver the Second Policy. Spectra paid Euler $29,700 for the Second Policy, which covered Spectra's sales from November 1, 2001, through October 31, 2002. The Second Policy stated that the maximum terms of sale for covered buyers was thirty days. The Second Policy also identified seventeen buyers that Spectra had agreed to provide coverage for on sixty-day terms of sale. Kmart was included on the Second Policy, but not identified as covered under sixty-day terms of sale. At this meeting, Gilbert, Metzger, and the Spectra broker reviewed the Second Policy.

Metzger claims that she pointed out to Gilbert that Kmart was not listed as covered subject to sixty-day terms of sale and that Gilbert promised her that it would be added to the policy on such terms–an allegation that is disputed by Euler. In any event, the Second Policy was never amended to cover Kmart on sixty-day terms.

During the second week of January, 2002, Euler cancelled coverage for Kmart for all of its policyholders–Spectra included–due to Kmart's rapidly deteriorating financial condition. On January 22, 2002, Kmart filed for bankruptcy protection. That same day, Spectra submitted a claim to Euler under the First and Second Policies for outstanding Kmart receivables in the amount of $869,802.55. Six days later, Euler denied the claim because Kmart's sixty-day terms of sale were outside the thirty-day maximum terms provided for under the First and Second Policies.

On November 15, 2002, Spectra filed suit against Euler in the Circuit Court of Cook County. The case was removed to this court on the basis of diversity jurisdiction. Count I of Spectra's Amended Complaint seeks a declaratory judgment that Spectra's losses from Kmart's nonpayment of receivables are covered under the Policies. Count II asks the court to reform the Policies to include an endorsement for sixty-day terms of sale for Kmart. Count III alleges bad faith under the Illinois Insurance Code. Count IV alleges common law fraud. Euler now moves for summary judgment on all counts and judgment on the pleadings as to count IV.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." Id. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must consider the record as a whole in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the

non-moving party. Id. at 255; Bay v. Cassens Transport Corp., 212 F.3d 969, 972 (7th Cir. 2000).

A party may also move for judgment on the pleadings following the close of pleadings. Fed R. Civ. P. 12(c). The appropriate standard for a judgment on the pleadings is "that applicable to summary judgment, except that the court may consider only the contents of the pleadings." Alexander v. City of Chicago, 994 F.2d 333, 336 (7th Cir. 1993). For this reason, judgment on the pleadings is warranted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. With these considerations in mind, we now turn to the present motion.

## DISCUSSION

Count I of Spectra's Amended Complaint seeks a declaratory judgment, pursuant to 735 ILCS 5/2-701, that the First and Second Policies cover Spectra's losses resulting from Kmart's unpaid receivables. The construction of an insurance policy and determination of the rights and obligations thereunder are questions of law for the court. Crum and Forster Managers Corp. v. Resolution Trust Corp., 620 N.E.2d 1073, 1077 (Ill. 1993). As such, summary judgment is a suitable method for interpreting an insurance policy or its terms. Id. In construing an insurance policy, "the primary function of the court is to ascertain and enforce the intentions of the parties *as*

*expressed in the agreement.*" Id. at 1078 (emphasis added). If the words in the policy are plain and unambiguous, the court will assign them their ordinary meaning and will apply them as written. Id. When reviewing the words of the policy, the court "will not search for ambiguity where the is none." Id.

An insurer's duty to defend arises if facts alleged in the complaint fall within, or potentially within, the policy's coverage. Outboard Marine Corp. v. Liberty Mutual Ins. Co., 607 N.E.2d 1204, 1212 (Ill. 1992). To determine whether an insurer has a duty to defend, a court compares the allegations in the underlying complaint with the relevant coverage provisions of the insurance policy. Guillen ex rel. Guillen v. Ins. Co. of Illinois, 785 N.E.2d 1, 150 (Ill. 2003). "If the facts alleged in the underlying complaint fall within or potentially fall within the coverage of the policy, the insurer's duty to [the insured] is triggered." Id.

The first pages of both the First and Second Policy contain under the heading "Item 5," "MAXIMUM TERMS OF SALE: 30 days." It is clear and unambiguous that both policies provide for coverage over buyers that sell on terms no greater than thirty days.[2] According to the complaint and the undisputed facts before us, at all relevant times Spectra sold to Kmart on sixty-day terms of sale. We therefore find that

---

[2] This is especially apparent on the Second Policy, where individual buyers are conspicuously identified if they are provided coverage under sixty-day terms of sale.

under the First and Second Policies, *as written*, Euler had no obligation to cover Spectra's losses from Kmart due to Kmart's terms of sale being in excess of the Policies' express provisions. Euler's motion for summary judgment as to Count I is accordingly granted.

Count II asks the court to reform the First and Second Policy "to include an endorsement for 60 Day terms for Kmart." Reformation of an insurance policy, as with other contracts, is an equitable remedy to be performed by the court. Board of Trustees of the Univ. of Illinois. v. Ins. Corp. of Ireland, 969 F.2d 329 332 (7th Cir. 1992). The purpose behind reformation is "to make a writing express the agreement that the parties intended it should." Id. (quoting Restatement (Second) of Contracts, § 155, cmt. a). Reformation of a contract "should only be allowed when clear and convincing evidence compels the conclusion that the instrument as it stands does not properly reflect the true intention of the parties, and that there has been either a mutual mistake or a mistake by one party and fraud by the other." Id. (quoting Magnus v. Barrett, 557 N.E.2d 252, 255 (Ill. App. Ct. 1990)). In the insurance context, the insured "is required to make a clear showing of what the insured intended to procure from the insurer, in addition to the insurer's knowledge of that intention based upon express directions from the insured or the insurer's knowledge of circumstances wholly inconsistent with the policy

provisions as issued." Zannini v. Reliance Ins. Co. of Illinois, Inc., 590 N.E.2d 457, 462 (Ill. 1992).

Spectra seeks reformation of the First Policy because the policy mistakenly endorsed Kmart on thirty-terms of sale, when both parties allegedly intended the policy to cover Kmart on sixty-day terms. Euler counters that there was never any intention on its part to cover any buyer under the First Policy on terms of sale greater than thirty days. Gilbert did not become aware that Spectra sold to certain accounts[3] on sixty-day terms until October 23, 2001–one week prior to the First Policy's expiration. Before this time, there is no way that anyone at Euler could know that Spectra wanted coverage beyond the thirty-day terms for which the First Policy provided. Gilbert then instructed Spectra to submit a list of customers sold to on sixty-day terms, so that these customers could be properly covered under the Second Policy that would soon go into effect. We therefore find that there was no intention on Euler's behalf to cover Kmart,

---

[3] Spectra claims that at the October 23, 2001, meeting, Cheung informed Gilbert that Spectra sold to Kmart on sixty-day terms of sale and asked the policies be changed accordingly. However, a close reading of Cheung's deposition reveals that, while he did tell Gilbert that Spectra had large accounts with sixty-day terms of sale, he did not specifically identify Kmart as such. Rather, the discussions at the meeting involving Kmart concerned Cheung's desire to increase its coverage, not to amend its terms of sale. Therefore, Spectra cannot present any factual support for its contention that Cheung told Gilbert that it wanted coverage for Kmart on sixty-day terms.

or any other buyer, for sixty-day terms under the First Policy, and grant Euler summary judgment on the reformation count as to the First Policy.

Spectra argues that the Second Policy should be reformed because of the parties' mutual mistake of not endorsing Kmart on sixty-day terms. The mistake on Spectra's end is apparent: Metzger inadvertently neglecting to include Kmart on the list of buyers it submitted to Euler to consider covering on terms of sale greater than thirty days. It is clear that Spectra considered Kmart to be one of its most important customers, and intended to obtain coverage over the account, regardless of its terms of sale.

Spectra contends that Euler's end of the mutual mistake was Gilbert's failure to transmit requests to insure Kmart on sixty-day terms to Euler's underwriting department. Both parties agree that on October 26, 2001, Metzger sent Gilbert an e-mail containing the language: "We need to change our terms of sale to 60 days across the board." Gilbert claims that he discussed this request with Anne Maddox ("Maddox") in Euler's underwriting department, who told him that Euler would not change to sixty-day terms of sale for all covered buyers, because the majority of Spectra's buyers were on thirty-day terms of sale. Spectra disputes this contention, citing Maddox's deposition testimony that she does not remember Gilbert requesting an across the board change in the maximum terms of sale provision to the Second

Policy. In any event, Spectra learned that there would not be across the board coverage on sixty-day terms by December 3, 2001, when Euler delivered the Second Policy which individually endorsed buyers with sixty-day coverage. There is no indication that Spectra made further demands for sixty-day terms of sale on a policy-wide basis.

While dispute surrounds the question of whether Gilbert submitted Metzger's "across the board" request to Euler's underwriting department, this does not necessarily establish that the conditions required for the reformation of a contract exist. Before a contract will be reformed, the moving party must show "by strong, clear and convincing evidence that there has been a meeting of the minds resulting in an actual agreement between the parties [and] that the parties agreed to reduce their agreement to writing." Alliance Syndicate, Inc. v. Parsec, Inc., 741 N.E.2d 1039, 1048 (Ill. App. Ct. 2000). A contract of insurance is established when "one of the parties to such a contract proposes to be insured and the other party agrees to insure, and the subject, the amount, and the rate of insurance are ascertained or understood and the premium paid if demanded." Zannini, 590 N.E.2d at 464 (quotations omitted). Even assuming Metzger's contentions as to her requests for sixty-day policy-wide terms of sale and for Kmart to be individually added on a sixty-day term are true, Metzger knew that Gilbert lacked the authority to change any terms of the policies. Spectra was aware that, without approval from the underwriting department, Euler would not make changes to

the policies, as Gilbert told Metzger that the endorsement of sixty-day accounts would have to be approved individually. There could thus be no settled understanding as to a policy's terms until the underwriting department's approval was relayed to Spectra. While he may have represented that he would work on getting Kmart approved, at no point did Gilbert tell anyone that Kmart had been approved on sixty-day terms.

Gilbert's alleged representations that he would submit Spectra's requests to underwriting have the potential to support a fraud claim (as will be discussed below), but they do not constitute an agreement to change the Second Policy's provisions. Accordingly, unless Gilbert represented that Kmart had been individually approved for coverage on sixty-day terms (or via an across the board change), Spectra should not have understood that its requests had been granted. Even if Gilbert knew that Spectra wanted Kmart insured on sixty-day terms, Spectra offers no evidence–let alone clear and convincing evidence–that there was an actual agreement or a pronouncement by Euler that Kmart would be insured under the conditions desired by Spectra. Because there is no indication Euler agreed to or represented that it would provide coverage for Kmart on sixty-day terms, a key element required to reform a contract is lacking. See Zannini at 465. We thus grant Euler's summary judgment motion as to reformation of the Second Policy.

Euler next moves for summary judgment on Count III of the Amended Complaint, which seeks costs and fees under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155. Section 155 allows a court to award attorney fees and costs against an insurer in a policy dispute whose conduct is determined to be "vexatious and unreasonable." 215 ILCS 5/155(1). "Although the question of what constitutes vexatious and unreasonable conduct is a fact-specific inquiry, the final evaluation of the insurer's conduct is made by the court." Bernstein v. Genesis Ins. Co., 90 F. Supp. 2d. 932, 940 (N.D. Ill. 2000) (citing Horning Wire Corp. v. Home Indem. Co., 8 F.3d 587, 590 (7th Cir. 1993)). As discussed above, because Spectra sold to Kmart on sixty-day terms of sale, which were in excess of the First and Second Policies' express provisions, Euler had no contractual duty to cover Spectra's losses resulting from Kmart's bankruptcy. For this reason we find that Euler acted neither vexatiously nor unreasonably in denying Spectra's claim because it sold to Kmart on sixty-day terms. Summary judgment on Count III is granted.

Euler finally seeks either judgment on the pleadings or summary judgment on Count IV, which alleges common law fraud. The elements of common law fraud in Illinois are: (1) a false statement of material fact; (2) the defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) the plaintiff's reliance upon the truth of the statement; and (5) damages

-15-

resulting from that reliance. Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 591 (Ill. 1996). According to the Paragraph 26 of the Amended Complaint, which presents the particulars of Spectra's fraud allegations,[4] Gilbert never submitted Metzger's request to change the policy-wide terms of sale to sixty days but then lied by telling Spectra that the request would not be approved by underwriting. For purposes of Federal Rule of Civil Procedure 12(c), this would satisfy the first two requisites of a fraud claim. The remainder of accusation is somewhat puzzling. Spectra contends that because Kmart was one of its largest accounts, it would not have purchased the Second Policy if Kmart was not covered on sixty-day terms. Spectra next states that if Gilbert had submitted the "across the board" request and it was denied, Gilbert would not be able to renew the Spectra and lose his valuable commission.

---

[4] Under Federal Rule of Civil Procedure 9(b), the circumstances supporting a charge of fraud must be pleaded with particularity. General Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078 (7th Cir. 1997). The Seventh Circuit has made clear that a *complaint* alleging fraud must contain the identity of the person making the representation, the time, place, and content of the misrepresentation, and the method by which it was communicated to the plaintiff. Kennedy v. Venrock Associates, 348 F.3d 584, 593 (7th Cir. 2003). Just as a plaintiff cannot amend his complaint through arguments in his brief in opposition to a motion for summary judgment, Speer v. Rand McNally & Co., 123 F.3d 658, 665 (7th Cir. 1997), the plaintiff cannot use a brief to present new allegations or particulars of fraud not contained in the complaint. Kennedy at 593. For this reason, we will only consider the specific episode of fraud as stated in the Amended Complaint.

In both the Amended Complaint and its opposition memorandum, Spectra argues that Gilbert's alleged false statement was intended to induce Spectra to purchase the Second Policy so he could collect his commission. However, this theory proves nonsensical when combined with Spectra's contention that it would not have purchased the Second Policy without Kmart on sixty-day terms. Under Spectra's version of Gilbert's fraud, we simply cannot deduce how Gilbert's purported misrepresentation about underwriting's denial of policy-wide sixty-day terms could be made with an intent to induce Spectra to renew its policy with Euler. In addition, once Spectra received the Second Policy, it became aware that Kmart was not covered under sixty-day terms of sale. At that point, Spectra should not have reasonably relied on Kmart being covered on sixty-day terms, regardless of the veracity of Gilbert's statements concerning his request to underwriting. Because key elements of a fraud claim is lacking from the Amended Complaint, we grant Euler judgment on the pleadings as to Count IV.

## CONCLUSION

Based on the foregoing analysis, Euler's motion for summary judgment is granted for Counts I, II, and III and its motion for judgment on the pleadings is granted as to Count IV.

```
                                    /s/ Charles P. Kocoras
                                    _____
                                    Charles P. Kocoras
                                    Chief Judge
                                    United States District Court
```

Dated: JUN 17 2004